IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| MICHAEL A. LOGAN | § | |
|---|---|---|
| v. | § | CIVIL ACTION NO. 6:08cv152 |
| SHERIFF PAT BURNETT, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Michael Logan, an inmate of the Van Zandt County Jail proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c). As Defendants, Logan named Sheriff Pat Burnett, investigator Randy Grimes, jailer George Flowers, the medical staff at the Van Zandt County Justice Center, and Van Zandt County, Texas.

An evidentiary hearing was conducted on February 10, 2008, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing and in his complaint, Logan stated that on September 14, 2006, he was "accused of sexual assault by a prostitute." This individual cut him with a razor, which Logan testified at the hearing was a box cutter; he stated that he received cuts on his left wrist, right forearm, stomach, and scalp.

Although he said that these cuts required immediate medical treatment, he went to the home of his sister's boyfriend, but no one was there. His car would not re-start, so he waited there until his sister and her boyfriend got home. They told him that he had been accused of sexual assault. Logan stated that he did not want to go to a local hospital because of the accusations against him and the boyfriend refused to take him to a hospital in Dallas, so he stayed at the house, washing his injuries and putting ointment on them.

1

The following Monday, four days later, Logan was arrested. He said that he was taken directly to the jail. The sheriff notified the news media that Logan had been arrested, and so Logan had to wait about 15 minutes for reporters to show up. The jail entrance had a sign saying that injured prisoners could not be brought into the jail until they were seen by medical personnel, but Logan was taken in anyway. He was stripped and photographed, and placed in a holding cell; the next day, around noon, he was placed in a maximum security cell.

Within a day or two after he was brought into the jail, Logan said, a nurse came by giving TB tests. She looked at his cuts through the slot in the door and told him to keep his wounds washed out, but did not take him out and examine him for his injuries.

Logan said that he submitted a sick call request, but received no reply. He also filed a grievance and received no reply. Logan said that it was common at the jail to get no answers to requests. He did not submit any other sick calls concerning his injuries.

About eight or nine months later, Logan said, he was finally seen by a nurse. He says that she had a ruler handy with which to measure his injuries, so he thinks that his mail had been read. By September of 2007, Logan said, his injuries had pretty much healed up, although he speculated that he may have suffered some "nerve damage." He says that all of the reports indicated that he had been "cut severely," and so everyone knew that he had been injured.

On cross-examination, Logan said that he saw a nurse in 2007, and she measured the cuts. The entry in the medical record has the date of September 28, 2006, although this date may be referring to the date of the TB test; Logan said that the exam by the nurse was in 2007, and the Court accepts his testimony as true and disregards all testimony or records from the evidentiary hearing which contradicts Logan's testimony. He again stated that he had submitted a sick call request but had received no answer, although he had placed it where it was supposed to be. Logan conceded that he did not submit any other sick call requests, and none appear in the medical records.

Logan stated that when he was arrested, he told Sheriff Burnett that he was hurting. He said that if an inmate needs medical care at night, the local EMS service is called; he acknowledged that during his stay in the jail, he was taken to Tyler, where he received an emergency appendectomy.

Sheriff Pat Burnett testified at the evidentiary hearing that he transported Logan to the jail himself. He stated that Logan had been cut, the wounds were not bleeding, and that Logan did not ask for medical care. Logan reiterated that he told the sheriff that he was "hurting," but conceded that he did not specifically request medical care. In September of 2008, Sheriff Burnett said, the jail had a full time nurse, but when an inmate needed medical assistant at night, the jail staff would call paramedics.

On cross-examination, Logan asked if Burnett did not think that he needed medical care. Burnett replied that Logan had four-day-old cuts which were clean and not infected, and which could not be stitched up.

Nurse Donna Dotson, LVN, also appeared and testified at trial. She stated that she was the jail nurse in September of 2006. Nurse Dotson stated that she visited with Logan briefly after his arrival, but that she never received a medical request from him. She said that she saw his cuts and that they were four days old and were healing, and that no doctor would sew up four-day-old cuts. She determined that the only thing to do for the cuts was to keep them clean and dry; they were healing, not swollen, and not infected, and so she told him to wash them and keep them clean.

On cross-examination, Nurse Dotson said that she did not take Logan to the nurse's station, and that he had everything he needed in his cell to take care of the cuts, including soap and hot water.

<u>Legal Standards and Analysis</u>

The crux of Logan's claim, as he stated in court, is the assertion that the Defendants have been deliberately indifferent to his serious medical needs with regard to the injuries which he sustained four days prior to being brought into the jail. The Fifth Circuit has held that pre-trial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining

officials. Thompson v. Upshur County, 245 F.3d 447, 457 (5th Cir. 2001); Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97,

4

107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756.

The case of Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999), presents an illuminating picture of what does and does not constitute deliberate indifference to serious medical needs. In that case, the plaintiff Eugene Stewart was incarcerated in May of 1993, at which time he was 67 years old and suffering from numerous ailments, including hypertension, arthritis, gout, and heart disease. In August of 1994, he was admitted to the hospital for treatment of swollen legs, a possible indication of congestive heart failure. He was treated for five days and then released, but the next day, the treating physician, Dr. Dial, was notified that Stewart had a large decubitus ulcer (i.e. a bedsore) on his back. He ordered cleansing of the ulcer, treatment with antibiotics, and placement on the sick call list; however, it was not clear why such a wound was not discovered during Stewart's stay in the hospital, rather than after his discharge.

Stewart was readmitted to the prison hospital on September 6, 1994, this time under the care of Dr. Kim. She took cultures from the ulcer, debrided the wounds, and administered antibiotics and IV fluids. Dr. Kim also ordered that the dressings be changed three times a day and that Stewart be repositioned every three hours, but acknowledged that due to staffing problems, the nurses sometimes did not carry out the doctor's orders.

Stewart's ulcers did not improved and he was transferred to a non-prison hospital for consultation and treatment. When he returned, Dr. Kim did not follow the free-world physician's advice to transfer Stewart to another facility for physical therapy. Instead, Dr. Kim ordered that Stewart be kept out of bed as much as possible and that the nurses move his extremities. She also transferred him to the care of another physician, Dr. Knutson.

Dr. Knutson treated Stewart's ulcers with medication, ordered that the dressings be changed twice a day, and that Stewart be repositioned every hour. He also checked the wounds periodically and ordered that Stewart get out of bed for extended periods of time.

However, Dr. Knutson conceded that he often did not read the nurses' notes, which said that Stewart had an infection from a catheter, and did not prescribe antibiotics. He did not see Stewart over the Thanksgiving four-day weekend, and saw him next on November 28, 1994, at which time Stewart appeared like he was going to die. Dr. Knutson tried to treat Stewart at the prison hospital but ultimately transferred him to the University of Mississippi Medical Center, where the attending physician stated that Stewart had "the worst bedsores she had ever seen." Stewart died on December 7, 1994.

Stewart's family sued Drs. Dial, Kim, Knutson, and Russell, the medical director at the prison facility. The district court granted summary judgment for the physicians, and an appeal was taken.

On appeal, the Fifth Circuit affirmed the grant of summary judgment. The Fifth Circuit concluded that there was no probative evidence that any of the doctors denied, substantially delayed, or intentionally interfered with treatment.

The dissenting opinion argued that Stewart had not received even rudimentary medical care. The dissent asserts that Dr. Dial was told the day after Stewart was discharged from hospital in August of 1994 that he had developed a 25-centimeter (10-inch) stage IV decubitus ulcer, which Dial apparently had not noticed in five days of treating him. Dr. Dial prescribed a regimen of cleansing, dressing, and antibiotics, but never checked to see if his orders were being carried out or if they were effective. Nor did Dr. Dial review the nurses' notes.

According to the dissent, Dr. Kim found that Stewart had developed multiple decubitus ulcers including a "very deep infection," and gave orders for their treatment. However, the dissent contended that Dr. Kim knew full well that the facility was too understaffed to carry out her orders, but made no effort to carry out a recommendation that Stewart be transferred to a facility where he could receive proper treatment. Finally, the dissent said that the nurses charted numerous symptoms of infection, but Dr. Knutson did not review these notes; although Dr. Knutson observed after Thanksgiving that Stewart had a urinary tract infection, he did not prescribe any antibiotics. Nonetheless, the dissent did not carry the day; the majority concluded that the doctors had provided

"active treatment" for Stewart's ailment and that there was no material fact issue to support the requisite deliberate indifference necessary for liability.

In the present case, the evidence shows that Logan was received at the jail four days after he received the injuries. The nurse testified that she looked at the cuts through Logan's cell door and they appeared to be healing, without infection or swelling, an impression confirmed by the photographs which were taken. Although Logan said that he thought he should have received stitches, Nurse Dotson said that no doctor would suture a four-day-old cut. *See, e.g.*, Laceration Repair, EPIC Healthcare Network, available on-line at http://www.epichealthcarenetwork.com/clinical%20practice/laceration.html (noting that lacerations over 12 hours old should not be sutured because of a significant infection risk); *accord*, http://www.uciemig.com/resources/suture Workshop_handout.pdf (suture manual of the University of California - Irvine Emergency Medicine Interest Group).

Instead, the normal treatment for such wounds is to keep them clean and dry, which is what Nurse Dotson told Logan to do, with the soap and hot water which was available to him. The fact that Logan did not receive all of the care for his wounds which he thought was appropriate, or that he disagreed with the course of action with which the nurse instructed him, does not show that the jail personnel were deliberately indifferent to his serious medical needs. As noted above, the fact that a prisoner does not receive "the best care that money can buy" does not show deliberate indifference to a serious medical need. Mayweather, 958 F.2d at 91; Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997). In this case, Logan was given proper instructions for the care of his injuries, and he conceded that these injuries healed without infection.

Furthermore, Logan testified that he filed only one medical request, and when it was not answered, he did not file another one. He also filed only one grievance, and when it was not answered, he did not file another one. By contrast, he filed no fewer than 27 requests asking to use the law library, as well as a request to be enrolled in Alcoholics Anonymous. While it is true that the jail officials knew about his injuries, the nurse had given him a course of treatment, and in the

7

absence of complaints from Logan, these officials could reasonably assume that this course of treatment was working and progressing normally; the absence of any infection or other adverse effects indicates that this was in fact the case. Although Logan speculated that he may have suffered "nerve damage," this speculation is insufficient to show that the jail officials were deliberately indifferent; the courts have held that when an inmate alleges a serious medical need either for treatment or to avoid certain conditions, the inmate's bare assertion of a serious medical condition is insufficient without medical evidence verifying that the condition exists. Aswegan v. Henry, 49 F.3d 461, 465 (8th Cir. 1995); *accord*, Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994) (prisoner's self-diagnosis alone will not support a medical conclusion). Logan has failed to show that the jail officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs, and so his claim of deliberate indifference to his serious medical needs, which includes his claims against Sheriff Burnett, investigator Rusty Grimes, jailer George Flowers, and the medical staff of the Van Zandt County Jail, is without merit.

Nor has Logan shown any basis for liability on the part of Van Zandt County. The Fifth Circuit has held that a municipality such as a county can be held liable for its policies and customs that engender constitutional deprivations, but that it cannot be held liable for the actions of non-policy-making employees under a theory of *respondeat superior*. Williams v. Kaufman County, 352 F.3d 994, 1013 (5th Cir. 2003); *see also* Colle v. Brazos County, Texas, 981 F.2d 237, 244 (5th Cir. 1993) (only when the execution of a county's policies or its customs deprives an individual of constitutional or federal rights does liability under Section 1983 result).

In Board of County Commissioners of Bryan County, Oklahoma v. Brown, 117 S.Ct. 1382 (1997), the Supreme Court rendered a decision on the liability of counties in Section 1983 lawsuits. That case involved the allegedly improper hiring of a sheriff's deputy without adequate review of his background, which included a record of driving infractions as well as guilty pleas to misdemeanors including assault and battery, resisting arrest, and public drunkenness.

The Court held that plaintiffs seeking to impose liability on a municipality under Section 1983 must identify a municipal policy or custom that caused the plaintiff's injury. A "policy" refers to decisions of a duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality, while a "custom" is a practice which has not been formally approved by an appropriate decision-maker, but which is so widespread as to have the force of law. A municipality may not be held liable solely on a theory of *respondeat superior*. Brown, 117 S.Ct. at 1388.

The Supreme Court cautioned that it is not enough for a plaintiff to identify conduct properly attributable to the municipality; rather, the plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged. In other words, the plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a causal link between the municipal action and the deprivation of federal rights. Brown, 117 S.Ct. at 1388.

There are two general types of cases which can arise in the realm of municipal liability. The first of these is where a plaintiff claims that a particular municipal action itself violates the law, or directs an employee to do so. Section 1983 contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right, but the plaintiff must always show the culpable state of mind necessary to establish the underlying constitutional violation. The Supreme Court observed that proof that a municipality's legislative body or authorized decision-maker intentionally deprived a plaintiff of a federal protected right necessarily shows that the municipality acted culpably, as does a conclusion that the action taken or directed by the municipality or its authorized decision-maker itself violates federal law. Brown, 117 S.Ct. at 1388-89.

The second type of case is that in which no allegation is made that the municipal action itself violated federal law, or that the municipality directed or authorized the violation of federal rights. The Supreme Court stated that these cases present much more difficult problems of proof because

the fact that the plaintiff suffered a deprivation of federal rights at the hands of a municipal employee is not itself enough to permit an inference of municipal culpability and causation. Brown, 117 S.Ct. at 1389-90. Thus, in the context of the facts of Brown, the Court held that a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences; a showing of simple or even heightened negligence will not suffice. Brown, 117 S.Ct. at 1390; *see also* Colle v. Brazos County, Texas, 981 F.2d 237, 244 (5th Cir. 1993).

In this case, Logan has not identified any action by Van Zandt County or by county sheriff Pat Burnett which violated his constitutional rights, much less any action which was taken with deliberate indifference to its known or obvious consequences. As explained above, Logan has not shown that any of the actions taken with regard to his injuries amounted to deliberate indifference to his serious medical needs, even though the course of treatment which was suggested to him may not have risen to the level of treatment which he thought should have been provided. His claim against Van Zandt County is without merit.

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke v. Williams, 490 U.S. 319, 327, (1989),

*citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Logan's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted. Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b). *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous. 28 U.S.C. §1915A. It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **17** day of **February, 2009.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE